*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* R. C. YOUNG, Minor.

UNPUBLISHED
March 13, 2026
11:09 AM

No. 374827
Monroe Circuit Court
Family Division
LC No. 22-028211-NA

Before: WALLACE, P.J., and GARRETT and ACKERMAN, JJ.

PER CURIAM.

Respondent-father appeals as of right a March 6, 2025 order, which terminated his parental rights to his minor child under MCL 712A.19b(3)(a)(*ii*) (parent deserted the child for 91 or more days), (c)(*i*) (conditions that led to adjudication continue to exist), (g) (failure to provide proper care and custody), and (j) (reasonable likelihood of harm if the child is returned to the parent). Respondent-father also challenges the trial court's April 2, 2024 order, which exercised jurisdiction under MCL 712A.2(b)(1) and (b)(2). We affirm.

## I. BACKGROUND

In October 2022, the Department of Health and Human Services (DHHS) filed a petition, alleging the minor child's mother was unable to provide proper care and custody to the child.[1] The child was taken into care, and child protective proceedings relating to respondent-mother commenced. Respondent-father was named as the minor child's putative father, but he failed to appear at a November 2022 putative father hearing despite being provided with notice. Although respondent-father knew about the proceedings, he did not participate in a hearing until June 2023. At that time, respondent-father was advised to establish himself as the minor child's legal father, which respondent-father did not do until November 1, 2023. Despite concerns about substance

---

[1] Respondent-mother is not a party to this appeal.

-1-

abuse and domestic violence between respondents, DHHS permitted respondent-father to have parenting time before it initiated further proceedings.

In February 2024, a supplemental petition naming respondent-father as the minor child's legal father was filed. The supplemental petition was authorized. After respondent-father pleaded to certain allegations, the trial court exercised jurisdiction and ordered respondent-father to comply with a case-service plan. Ultimately, respondent-mother released her parental rights to the minor child under the Michigan Adoption Code, MCL 710.21 *et seq*. Because respondent-father failed to make progress, and because of the amount of time the minor child had been in care, the permanency planning goal was changed to adoption. In October 2024, a petition for termination of respondent-father's parental rights was filed.

On November 20, 2024, the termination hearing commenced and continued over six dates, finally ending on February 3, 2025. After the termination hearing commenced, respondent-father's parenting times were suspended because of his aggressive behavior, failure to participate in services, and continued substance use, including having tested positive for cocaine in late November 2024. The termination hearing scheduled to be held on December 19, 2024 was adjourned because respondent-father appeared at the hearing with a blood-alcohol content of 0.328.[2] The caseworker testified about respondent-father's lack of progress, unwillingness to comply with services, and concerning behavior.[3] Respondent-father requested more time to participate in services, but he also denied required services. Respondent-father blamed respondent-mother for the minor child entering care. The trial court entered an order terminating respondent-father's parental rights as described above. The trial court found reasonable reunification efforts were made. This appeal followed.

## II. ADJUDICATION

Respondent-father argues his plea at the adjudicative stage of the proceedings was defective, and there was not a sufficient factual basis to support adjudication under MCL 712A.2(b)(1) or (b)(2). Respondent-father also argues his due-process rights were violated. We disagree.

### A. PRESERVATION AND STANDARD OF REVIEW

Because respondent-father failed to raise his arguments concerning adjudication before the trial court, they are unpreserved. See *In re Ferranti*, 504 Mich 1, 29; 934 NW2d 610 (2019); *In re Pederson*, 331 Mich App 445, 462-463; 951 NW2d 704 (2020). This Court reviews unpreserved issues in child protective proceedings for plain error affecting substantial rights. *In re Pederson*, 331 Mich App at 463. "To avoid forfeiture under the plain-error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or

---

[2] To provide context, we note that 0.328 would be more than four times the amount at which a person operating a motor vehicle would be deemed to be driving while intoxicated.

[3] We acknowledge there was more than one caseworker during the proceedings. We refer to one singular caseworker for purposes of brevity.

obvious, 3) and the plain error affected substantial rights." *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011) (quotation marks and citations omitted). "[A]n error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *In re Utrera*, 281 Mich App 1, 9; 761 NW2d 253 (2008). Reversal is only warranted when the plain error "seriously affect[ed] the integrity, fairness, or public reputation of the judicial proceedings." *In re Mota*, 334 Mich App 300, 311; 964 NW2d 881 (2020).

## B. ANALYSIS

Child protective proceedings are generally divided into two phases: the adjudicative phase, which determines whether the court can take jurisdiction over a juvenile, and the dispositional phase, which determines what action will be taken on behalf of the juvenile. *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014). Once jurisdiction is established, the trial court "can enter dispositional orders, including an order terminating parental rights." See *In re Boshell/Shelton*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 371973); slip op at 3 (quotation marks and citation omitted).

> Although child protective proceedings are initiated to protect children, the adjudicative phase is of critical importance because the procedures used in adjudicative hearings protect the parents from the risk of erroneous deprivation of their parental rights. Adjudication protects the parents' fundamental right to direct the care, custody, and control of their children, while also ensuring that the state can protect the health and safety of the children. [*Id*. at ___; slip op at 3 (quotation marks and citations omitted).]

"[T]he petitioner has the burden of proving by a preponderance of the evidence one or more of the statutory grounds for jurisdiction alleged in the petition." *In re Sanders*, 495 Mich at 405 (citation omitted). When determining whether it has jurisdiction in a case, "the trial court must examine the child's situation at the time the petition was filed." *In re Long*, 326 Mich App 455, 459; 927 NW2d 724 (2018) (quotation marks and citation omitted). A trial court need not find more than one statutory ground for jurisdiction. See MCL 712A.2(b); *In re SLH*, 277 Mich App 662, 669; 747 NW2d 547 (2008).

The trial court may hold a trial, but "[a] parent may also waive his or her right to a trial and admit the allegations in a petition or plead no contest to them." *In re Pederson*, 331 Mich App at 464. "[T]he Due Process Clause of the Fourteenth Amendment requires that, for a plea to constitute an effective waiver of a fundamental right, the plea must be voluntary and knowing." *In re Ferranti*, 504 Mich at 21. Jurisdictional pleas in child protective proceedings are governed by MCR 3.971, which reflects certain due-process guarantees. *In re Pederson*, 331 Mich App at 464-465. The record establishes that the referee who presided over the plea hearing advised respondent-father of all the rights listed in MCR 3.971(B)(1)-(4). Respondent-father, who was represented by counsel, acknowledged he was giving up the rights listed in those subsections by "entering into th[e] plea agreement." The terms of the "plea agreement" were stated on the record at the beginning of the hearing, and respondent-father confirmed he understood the terms. Respondent-father also confirmed he "had an adequate opportunity to think about this and discuss [it] with [his] attorney[.]" When asked if he was satisfied with his counsel's representation "up to

th[at] point," respondent-father responded: "Yes." He also confirmed he was entering the plea on his "own free will[.]"

A review of the hearing transcript also reveals a detailed colloquy that occurred between the referee and respondent-father, which reviewed all aspects of the plea and an explanation as to the consequences of the plea. The referee reviewed the allegations in detail, and respondent-father made admissions. It is clear respondent-father's plea was only accepted after respondent-father provided " 'support for a finding that one or more of the statutory grounds alleged in the petition [were] true. . . .' " See *In re Baham*, 331 Mich App 737, 746; 954 NW2d 529 (2020), quoting MCR 3.971(D)(2).[4] The referee found the plea was knowingly, understandingly, and voluntarily made; and the trial court adopted these findings and accepted the plea. Because the referee complied with the relevant portions of MCR 3.971(B) and (D) to ensure the plea was voluntarily and knowingly made, the manner in which the trial court assumed jurisdiction did not violate respondent-father's due-process rights. See *In re Ferranti*, 504 Mich at 21.

With respect to the trial court's decision to exercise jurisdiction, respondent-father's admissions support that, when able to do so, he neglected or refused to provide proper or necessary support for the minor child under MCL 712A.2(b)(1). Respondent-father admitted he was aware of the child protective proceedings. However, as of March 26, 2024, he had not communicated with "the assigned worker" to address the minor child's needs since July 14, 2023. Respondent-father further admitted, on November 1, 2023, that he established himself as the minor child's legal father through an affidavit of parentage. As of March 26, 2024, respondent-father admitted that he lacked income and housing that was appropriate for his and the minor child's needs. These admissions established, by a preponderance of the evidence, the minor child needed more care than respondent-father could provide. See, e.g., *In re Hockett*, 339 Mich App 250, 255-256; 981 NW2d 534 (2021). The trial court's finding is consistent with "the underlying purpose of the statutory scheme," which "is to protect children from an unfit homelife." *In re Hockett*, 339 Mich App at 255 (quotation marks and citation omitted). A trial court need not find more than one statutory ground for jurisdiction. See MCL 712A.2(b); *In re SLH*, 277 Mich App at 669. Thus, we affirm the trial court's decision to exercise jurisdiction.

## III. REASONABLE REUNIFICATION EFFORTS AND DUE-PROCESS RIGHT TO NOTICE

Respondent-father next argues DHHS failed to make reasonable reunification efforts. Respondent-father also argues DHHS failed to notify him of what was required in order to preserve his parental rights, depriving him of the fundamental fairness required for due process. We disagree.

---

[4] Respondent-father notes two of the allegations "were not original allegations in the supplemental petition for jurisdiction." It is true that certain allegations in the February 2024 supplemental petition were amended. However, MCR 3.971(A) permits this very practice.

## A. PRESERVATION AND STANDARD OF REVIEW

"In order to preserve an argument that [DHHS] failed to provide adequate services, the respondent must object or indicate that the services provided to them were somehow inadequate. . . ." *In re Atchley*, 341 Mich App 332, 336; 990 NW2d 685 (2022) (quotation marks and citation omitted). Respondent-father preserved this reasonable reunification efforts argument by filing a motion to dismiss arguing, *inter alia*, that various services were not provided to him, including receiving no services to assist him with finding housing, employment, or childcare. "It is because of the constantly changing dynamic in a child protective case that a respondent has multiple opportunities to, as the circumstances change, object to the adequacy of the services being provided." *Id*. at 337-338. Here, shortly after the court authorized a supplemental petition for termination of parental rights, respondent filed the above motion. Thus, the reasonable efforts argument is preserved. See *id.* at 336-337.

"We review the trial court's findings regarding reasonable efforts for clear error." *In re Smith*, 324 Mich App 28, 43; 919 NW2d 427 (2018).

## B. REASONABLE REUNIFICATION EFFORTS

Generally, DHHS "has a statutory duty to make reasonable efforts to reunify the child and the family . . . ." *In re Atchley*, 341 Mich App at 338 (quotation marks and citation omitted). Before the trial court "may enter an order of disposition," DHHS "must provide an initial service plan." *In re Rood*, 483 Mich 73, 95-96; 763 NW2d 587 (2009). The case-service plan outlines the steps DHHS "and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re Atchley*, 341 Mich App at 338-339 (quotation marks omitted), citing *In re Hicks/Brown*, 500 Mich 79, 85-86; 893 NW2d 637 (2017).

Respondent-father first argues DHHS did not comply with its own internal policies because caseworkers failed to "involve" him in the development of the case-service plan, which resulted in the services not being tailored to respondent-father's particular needs. Respondent-father cites a portion of the DHHS Children's Foster Care Manual (CFF), which states the DHHS "**requires** the engagement of the family in development of the service plan," including "all parents/guardians . . . ." CFF 722-06, p 2.

> The family is to be extensively involved in case planning and have a clear understanding of all the conditions that must be met prior to the child's return home, how these relate to the petition necessitating out-of-home placement, and what the supervising agency will do to help the family meet these conditions. [CFF 722-06, p 2.]

Between the time the minor child entered care in October 2022, and the time of the putative father hearing in November 2022, DHHS made extensive efforts to locate and contact respondent-father. Respondent-father acknowledged he was aware of the putative father hearing, but he nonetheless failed to appear. Respondent-father did not participate in the proceedings, which were largely held over videoconferencing, until June 5, 2023. Respondent-father was given advice as to how to establish himself as the minor child's legal father at hearings held on June 5, 2023 and July 11, 2023. After a domestic violence incident with respondent-mother, respondent-father did

not participate in the October 4, 2023 hearing; and he did not establish himself as the minor child's legal father until November 1, 2023. At that time, DHHS decided to file a supplemental petition and name respondent-father as a respondent in the child protective proceedings. The supplemental petition was filed on February 21, 2024. In the meantime, DHHS permitted respondent-father to have supervised parenting time.

At the March 13, 2024 preliminary hearing, when asked what efforts were made to eliminate the need for "removal," the caseworker listed: (1) meeting with respondent-father; (2) scheduling parenting times; (3) discussing services; (4) gathering information from respondent-father; and (5) providing bus passes. The caseworker also reviewed the supplemental petition and the proposed case-service plan with respondent-father. Respondent-father agreed he had "a chance to talk to" the caseworker, and he did not contradict her statements. At the March 26, 2024 initial dispositional hearing, the caseworker noted she drafted the case-service plan on March 4, 2024. Respondent-father, who had the opportunity to review the case-service plan and was represented by counsel at that time, did not object to the trial court adopting it. Respondent-father's argument that DHHS failed to involve him in the development of the case-service plan is contradicted by the record.

Additionally, the record wholly belies respondent-father's argument that the case-service plan was not tailored to meet his needs. At the October 24, 2022 hearing, when DHHS was attempting to locate respondent-father, respondent-mother expressed concern about respondent-father's substance abuse, issues with domestic violence, and inability to safely care for the minor child. On March 26, 2024, before the trial court authorized the supplemental petition or exercised jurisdiction, the caseworker testified that she had already made efforts to assist respondent-father with reunification. The efforts included: (1) setting up parenting times; (2) offering respondent-father parenting services to assist him and the minor child "with bonding and attachment"; and (3) "discussing the process for court." The initial dispositional hearing was also held on March 26, 2024, after respondent-father pleaded to certain allegations. At that point, the caseworker, who was knowledgeable about the case, believed the proposed services would assist respondent-father achieve reunification. When asked if he had objections to the case-service plan, counsel for respondent-father responded: "No."

As noted by respondent-father, although he was referred to parenting education services early in the proceedings, he was placed on a waiting list. Respondent-father began parenting education on August 20, 2024 and was assigned a parenting coach. As of September 2024, respondent-father had completed three out of 16 parenting classes. There were concerns respondent-father appeared to attend parenting times in an intoxicated state, and he appeared to know very little about parenting as it pertained to the issues of safety and structure. Nonetheless, respondent-father expressed frustration with having to complete parenting services. After the termination petition was filed in October 2024, respondent-father was terminated from the parenting education service by the provider due to the pending termination proceedings. While respondent-father argues he could have benefited from continuing to participate in the service, respondent-father's parenting times were suspended in December 2024 because of respondent-father's aggressive behavior in the presence of the minor child. Respondent-father also continued to test positive for substances, including cocaine. The substance screenings were administered when respondent-father appeared for parenting time. Despite his obvious issues with anger management, impulse control, and substance abuse, respondent-father denied he required services.

Respondent-father also contradictorily denied he required further assistance with parenting, and denied that parenting was difficult. We find that respondent-father has failed to demonstrate that he would have benefited from continuing participation in the parenting education services.

DHHS also referred respondent-father for a psychological evaluation. Licensed psychologist Tracy L. Gomez stated: "Psychological testing for personality is recommended. However, [respondent-father] may be resistant to this and may potentially invalidate the testing results." Gomez reviewed respondent-father's substance abuse evaluation, which was also completed during the proceedings. She opined respondent-father "may benefit from co-occurring (mental health and substance use) counseling." Notably, in the substance abuse assessment, it was recommended respondent-father complete Level 2 intensive outpatient substance abuse treatment several times each week, which would include individual therapy and group counseling.

Respondent-father argues he should have been provided additional psychological testing, as recommended by Gomez in the psychological evaluation. Respondent-father speculates further testing could have resulted in a mental health diagnosis. However, the record supports DHHS was responsive to respondent-father's mental health issues. Respondent-father was referred to Catholic Charities and Harbor Light for services. The caseworker discussed "treatment" with respondent-father on June 27, 2024, July 2, 2024, July 11, 2024, and July 25, 2024. On August 13, 2024, the caseworker asked respondent-father "if he had any updates on whether any appointments had been set for services." Respondent-father reported he had "some sort of appointment set for" August 27, 2024, but he was not sure of the nature of the appointment. Respondent-father reported it was "all a waste of time." During the termination hearing, respondent-father behaved erratically, appeared at one hearing in a highly intoxicated state, and denied he required services or treatment. The record is clear, despite services being offered to respondent-father, he failed to participate in the services to address his mental health issues during the proceedings.

Respondent-father also speculates that further psychological testing "could have led to a situation where [respondent-father] was diagnosed with a disability, thus obligating DHHS to comply under" the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq*. It is true that, if a parent suffers from a disability under the ADA or suffers from *a known or suspected* intellectual, cognitive, or developmental impairment, DHHS has a duty to reasonably accommodate the parent's disability by offering services designed to facilitate reunification of the family. *In re Sanborn*, 337 Mich App 252, 263; 976 NW2d 44 (2021). However, a public entity cannot be required to provide reasonable accommodations for a disability of which it is unaware. See *In re Hicks/Brown*, 500 Mich at 87. In support of his argument that the department failed to reasonably accommodate his alleged disability, respondent relies upon *In re Hicks/Brown*; however, the facts of the present case are readily distinguishable. The department knew that the respondent in *In re Hicks/Brown* suffered from a disability, e.g., she was found to have immediately observable cognitive defects and was found to have an IQ of 70. *Id*. at 87 n 5. In the present case, respondent-father merely speculates that he had a mental health issue that could have resulted in protections under the ADA. But conclusory statements are insufficient to establish that respondent is entitled to relief on appeal. See, e.g., *In re Sanborn*, 337 Mich App at 265-266.

Respondent-father also argues DHHS rushed to terminate his parental rights, without providing him with sufficient time to benefit from services. In so arguing, however, respondent-father does not suggest the trial court failed to abide by the applicable statutory timing

requirements. Rather, respondent-father argues the trial court only allowed him minimal time to benefit from services. However, "the Legislature did not intend that children be left indefinitely in foster care, but rather that parental rights be terminated if the conditions leading to the proceedings could not be rectified within a reasonable time." *In re Dahms*, 187 Mich App 644, 647; 468 NW2d 315 (1991). Respondent-father cites no authority for the proposition that the 10 months that passed from the initial dispositional hearing to the final termination hearing was an insufficient amount of time to form conclusions concerning his progress, or lack thereof, with the services necessary for reunification. Notably, at the time of termination, the minor child had never been in respondent-father's care and had spent a vast majority of his young life in foster care.

In sum, contrary to respondent-father's arguments on appeal, he was provided sufficient time to participate in, and benefit from, services. However, he failed to uphold his "commensurate responsibility" to participate in the services offered by DHHS. See *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). There is no indication respondent-father would have fared better if DHHS had offered other services, or accommodations, to assist him. See *In re Fried*, 266 Mich App 535, 543; 702 NW2d 192 (2005). Thus, the trial court did not err by finding respondent-father was provided with services to aid in reunification.

## C. ALLEGED DUE-PROCESS VIOLATION

Respondent-father also argues the trial court erred by depriving him of his fundamental right to the care and custody of the minor child, "without adequate notice of what was expected of him in violation of his constitutional right to due process." "It is axiomatic that a parent has a fundamental liberty interest in the care, custody, and management of his or her child, which is constitutionally protected." *In re TK*, 306 Mich App 698, 706; 859 NW2d 208 (2014). "Both the Michigan Constitution and the United States Constitution preclude the government from depriving a person of life, liberty, or property without due process of law." *Id.* (quotation marks and citation omitted).

> There are two types of due process: procedural and substantive. Procedural due process requires notice and a meaningful opportunity to be heard before an impartial decision-maker. The essence of a substantive due process claim is the arbitrary deprivation of liberty or property interests. Ultimately, due process requires fundamental fairness. [*Id.* (citations omitted).]

To that end, DHHS "must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re MJC*, 349 Mich App 42, 50; 27 NW3d 122 (2023) (quotation marks and citation omitted). "Pursuant to MCL 712A.18f(1) and (2), the case service plan must be in writing, and it must be available to the court and all the parties to the proceeding." *In re Walters*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 369318); slip op at 8 (quotation marks omitted). "The case service plan is presented to the court prior to an order of disposition, and it then may order compliance with all or any part of the case service plan as the court considers necessary." *Id.* at ___; slip op at 8 (quotation marks and citation omitted).

Respondent-father's argument that he lacked notice of what was expected of him in the child protective proceedings is without merit. As already discussed, respondent-father was

involved in the creation of the case-service plan that was approved by the court. The case-service plan was discussed at the initial dispositional hearing, and respondent-father had ample time to review it with his appointed counsel. Respondent-father was ordered to comply with the case-service plan, which was attached to the initial order of disposition. Respondent-father's progress with services was repeatedly discussed between the first review hearing and the final termination hearing. Respondent-father participated in the hearings, and he was encouraged to comply with services so that he could be reunited with the minor child. The record also supports services, and compliance with the case-service plan, were discussed with respondent-father outside of court proceedings. Nonetheless, respondent-father refused to comply. We conclude DHHS did not fail to notify respondent-father of what was required in order to preserve his parental rights. He was not deprived of the fundamental fairness required for due process. See *In re Walters*, ___ Mich App at ___; slip op at 8-9.

Affirmed.

/s/ Randy J. Wallace
/s/ Kristina Robinson Garrett
/s/ Matthew S. Ackerman